WALLACE (MASON v.). See Cases Nos. 9,-255 and 9,256.

## Case No. 17,102.

### WALLACE v. MUNFORD et al.

[Betts' Scr. Bk. 515.]

District Court, S. D. New York.    April 18, 1855.

SEAMEN'S WAGES—TRANSHIPMENT OF CARGO AND SALE OF VESSEL.

[1. A ship contracted to carry guano from the Chincha Islands to Baltimore for $12 per ton. She proved unseaworthy, and at Pernambuco she was condemned, and sold on the recommendation of surveyors. The cargo was transhipped by order of the shipowner's agents, and carried to Baltimore at $13.88 per ton, that being the lowest rate obtainable. *Held* that, on these facts, the seamen were entitled to wages, as the original freight contracted for was earned by delivery of the cargo at its destination.]

[2. Seamen are entitled to wages when freight is or might be earned on the voyage, and their right thereto is not taken away when freight is not earned through the fault of the shipowner or his agent.]

[This was a libel by John Wallace against B. A. Munford and others to recover wages.]

INGERSOLL, District Judge. On the 21st of August, in the year 1850, the libellant, at the port of San Francisco, in California, shipped on board the ship Palestine, owned by the respondents, for a voyage to Callao; thence to one or more ports in Peru, for a cargo; and thence to a port of discharge in the United States. The wages to be paid the libellant were $75 per month to a port in Peru, and the going rate of wages afterwards. The ship arrived at Callao, in ballast, on the 30th of October in the same year. She afterwards sailed for the Chincha Islands, and there took in a cargo of guano on freight, to be carried to Baltimore. Having taken the cargo on board, she returned to Callao, and on the 31st of December in the same year sailed for Baltimore. Upon the sailing of the ship from Callao to Baltimore, the libellant was employed as second mate, and from that time, while he remained on board the ship, he acted as such. On the voyage it was found that the ship leaked badly, in consequence of which, on the 18th of March, 1851, she put into Pernambuco. On the 19th of March a survey was had of the ship, and it was certified by the surveyors that she was in an unsafe condition to proceed on her voyage, and it was certified by them that the ship be discharged of her cargo as expeditiously as possible. After the ship was discharged of her cargo on the 15th of April, another survey of her was had under the direction of the consul. On that survey it was certified by the surveyors that what was required to put the ship in repair would amount to a sum far beyond her value. They therefore recommended, as the best course to be pursued, that the ship be sold at public auction for the benefit of whom it might concern. In pursuance of that recommendation of the surveyors, the ship, on the 5th of May, was sold at public auction to the highest bidder. On the 15th of May the libellant was discharged by the captain. The guano was, by the agents of the respondents, transhipped in another vessel, and in such other vessel was safely carried from Pernambuco to Baltimore, its port of destination, and there safely delivered to the consignees. The agreement between the owners of the Palestine and the shippers of the guano was to carry the guano from the Chincha Islands to the port of Baltimore, and there deliver the same for freight and the price, of twelve dollars a ton. The owners of the Palestine paid for the transportation of the guano from Pernambuco to Baltimore in the vessel in which it was transhipped, at and after the rate of $13.88 a ton, which said last mentioned sum was the lowest price for which such transportation could be obtained.

The libellant claims that wages are due him for the services which he rendered on board the ship, and the libel is filed to enforce the payment of such wages. It is insisted on the part of the respondents, that there are no wages due; that no freight has been earned; "that freight is the mother of wages," and when there is no freight earned there are no wages to be paid. It has often been doubted whether the maxim that "freight is the mother of wages" is founded on considerations of equity and sound policy. The par-

1 [Originally published from the MSS. of Hon. Bushrod Washington. Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

liament of Great Britain, considering that there was neither equity nor sound policy in the maxim, have lately, by statute, abolished it; so that now, on board of British ships, the more sound rule, that "the laborer is worthy of his hire," is adopted in its place. Congress has not as yet legislated on this subject, and the maxim which has been repudiated by the parliament of Great Britain, is still recognized in our courts as a rule of law. But this general rule is subject to several important exceptions. By the exceptions established, it follows that although this maxim is admitted by our courts as a general rule of law; yet in its application to particular cases it is by no means true, that in all cases where there is no freight earned there can be no wages paid. When the ship is unseaworthy at the time of her sailing, and in consequence thereof the ship and cargo are lost, by which loss no freight is earned, yet, notwithstanding this, the seamen are entitled to their wages. In such a case freight is not "the mother of wages." As a general rule, to earn freight the cargo must be delivered at its port of destination. But where there has been a condemnation of the ship and cargo for an illegal trading, in which the mariners are not implicated, and in consequence of which the cargo is not delivered according to the contract, and no freight is due, there is no forfeiture of wages. They are payable. The Malta, 2 Hagg. Adm. 158. The true doctrine on this subject is, that seamen are entitled to wages for the full period of their employment in the ship's service for any particular voyage in which freight is or might be earned by the owners; and if, by the fault of the ship owner or his agent, freight is not earned, the seamen are entitled to their wages, the same as if it had been earned. Pitman v. Hooper [Case No. 11,186]. But in this case it is not necessary to determine under what circumstances the seamen are entitled to their wages when there is no freight earned; for, upon the facts as they have been exhibited on the trial, I am of the opinion that freight has been earned, and consequently that the libellant is entitled to his full wages.

The respondents, in the month of December, in the year 1850, received at the Chincha Islands, from certain shippers, a quantity of guano to be transported to Baltimore, and there safely delivered. They agreed so to transport it and deliver it, and for such transportation and delivery the shippers agreed to pay them freight at the rate of $12 a ton. At the Chincha Islands the respondents received the guano on board the ship Palestine, owned by them. In that ship they transported it a part of the way to its port of destination and delivery, as far as Pernambuco. The ship put into the latter port in consequence of a leak, and for the purpose of repairs. When she arrived at Pernambuco no freight had been earned. No freight could be earned until the guano had, according to the contract entered into between the respondents and the shippers, been safely transported to Baltimore. The obligation of that contract rested upon them. Nothing had happened to excuse them from its performance; and if it was not performed it was through their fault, and the libellant is not to be prejudiced in his claim, by any fault of the respondents. Upon a survey of the ship at Pernambuco, it was found that she needed extensive repairs to enable her to prosecute the voyage, and to enable the respondents, by means of that ship, to perform the contract which they had entered into. The duty to transport and deliver still remained, and the payment of freight depended upon the performance of that duty. To enable the respondents to perform that duty, there were several courses which the captain had a right to pursue. He had a right, if he had funds belonging to the respondents, to expend them in the necessary repairs of the ship; and, if he had no such funds, he had a right, for that purpose, to borrow money upon the personal responsibility of the respondents. If that could not be done, he had a right to raise the amount necessary upon a bottomry bond; and he had a right, in case of necessity, to add thereto a respondencia obligation, binding the cargo. He had also the further right to tranship the cargo in another vessel. One of these courses it was his duty to adopt, to enable the respondents to execute their contract to transport to and deliver at Baltimore, and thereby to enable them to demand freight.

The surveyors, believing that the expense of repairing the ship and putting her in proper order would exceed the value of the ship, recommended that she be not repaired, but that she be sold for the benefit of whom it might concern. She was accordingly sold, and the respondents employed another vessel to transport the guano at the rate of over $13 a ton. It was for the benefit of the respondents that that course was adopted. In such other vessel, so procured by the respondents, the guano was safely transported to Baltimore, and there safely delivered. By such transportation and delivery the respondents were at Baltimore entitled to receive the freight money, which was to be paid to them by virtue of the contract entered into by them at the Chincha Islands. Freight therefore was carried by the services of the seamen on board the Palestine. Without their services at the pumps during the time the ship was leaking badly, and the other services which they performed on the voyage from Callao to Pernambuco, the ship and cargo would have been lost. The respondents would have lost their ship, and they would also have lost their right to demand freight. By such efforts the ship was carried in safety to Pernambuco, and the respondents have saved their freight. The wages of the seamen should therefore be paid; and the libellant, being one of such seamen, is entitled to receive his wages according to the terms of the contract entered into by him. To deprive seamen of their wages under such

circumstances would be against sound policy and equity; no case has been cited to authorize any such harsh rule.

It is further contended on the part of the respondent, that if there was ever a claim for wages on the part of the libellant, that claim has been satisfied and discharged by the payment to him of a certain sum, which on the 15th day of May, 1854, he received at Pernambuco; that that payment was an accord and satisfaction of any claim which the libellant may have had; and that the writing which he executed was a discharge of the same. The Palestine, in pursuance of the recommendation of the surveyors, was sold at Pernambuco. The libellant received from the counsel a certain portion of the net proceeds of the ship, and executed a writing which shows the object of the payment and the purposes for which it was made, as expressed in the writing. The money received by the libellant from the consul was "in full of my proportion of the net proceeds of the ship Palestine, condemned and sold at Pernambuco for wages due as 2d mate of said vessel." The libellant, for his wages, had a claim against the ship and against the respondents. The money received by him was not in full of all claim of wages against the respondents; it has no such operation. It operated only to discharge his lien against the ship and the proceeds thereof. By discharging his lien on the ship and its proceeds, the libelant did not discharge his claim against the respondents. A lien may be discharged without discharging the claim upon which the lien is founded; and a valid claim against a party is not affected by the discharge of a lien given by law to him for the security of such valid claim. The money therefor received by the libelant from the consul at Pernambuco, and the writing then executed by him, did not discharge any claim which the libellant had against the respondents, and was not an accord and satisfaction of the same. The effect of the writing was only to discharge his lien upon the ship and its proceeds, and the payment made to him was only effective to discharge such lien, and reduce the claim which the libellants had against the respondents.

The decree therefore must be in favor of the libellant; and it is referred to a commissioner to ascertain and report the amount due him; and in fixing the amount, the commissioner will allow wages to the libellant from Aug. 21 to Oct. 30, 1850, at the rate of $75 per month, from the said Oct. 30 to Dec. 31. at the rate of $30 a month, and from the last mentioned date to May 15, 1851, the time when he was discharged by the captain, at the rate of $35 a month. The commissioner will also allow the libellant for the time necessary for his return home after he was so discharged, and for his necessary expenses in returning, two months' additional pay, to wit, $70. An allowance of this character is made by the court even when there can be no allowance for the extra wages, as given by the act of congress upon the voluntary sale of a ship in a foreign port. The Dawn [Case No. 3,666].

From the aggregate of these several sums, the commissioner will deduct the payments which have been made to the libellant, and report the balance in his favor at six per cent.